Sara G. SERBIN and George Baker, individually, and on behalf of all others similarly situated, Appellants,

v.

ZIEBART INTERNATIONAL CORPORATION, INC. and Ziebart Corporation, Appellees.

Sheilah GUARINO, Appellant,

v.

SUN COMPANY, INC., Sun Refining & Marketing Company, Robert McClements, Jr., David Zebley and Wells, Rich, and Greene, Inc., Appellees.

Nos. 92–3689, 93–5321.

United States Court of Appeals, Third Circuit.

Argued May 20, 1993.

Consolidated for purpose of disposition by Court Order dated June 24, 1993 with Appeal at No. 93–5321.

Submitted Under Third Circuit LAR 34.1(a) Oct. 29, 1993.

Decided Nov. 30, 1993.

Sur Petition for Rehearing in No. 93–5321 Dec. 29, 1993.

Samuel J. Cordes, Andrew G. Sykes, Nancy A. Walker (argued), Ogg, Jones, DeSimone & Ignelzi, Pittsburgh, PA, for appellants in No. 92–3689.

Gary P. Hunt, Richard B. Tucker, III (argued), Tucker Arensberg, P.C., Pittsburgh, PA, for appellees in No. 92–3689.

John F. Innelli, Rudolph, Seidner, Goldstein, Rochestie, Salmon & Dorian, Philadelphia, PA, Joseph J. Baldassari, Heaney, Kilcoyne & Furey, Pennsauken, NJ, for appellant in No. 93–5321.

James M. Beck, Jon A. Baughman, Pepper, Hamilton & Scheetz, Philadelphia, PA, for appellees in No. 93–5321.

Before: STAPLETON and ALITO, Circuit Judges and POLLAK, District Judge *.

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

POLLAK, District Judge:

These two cases have been consolidated on appeal because, in challenging dismissal of their respective claims, plaintiff-appellants present the same question of law. The question of law is whether consumers of goods or services in interstate commerce who allege that, to their detriment, they purchased such goods or services in reliance on the advertising claims of the vendor, have a federal cause of action under subsection 1 of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), against the vendor.

Taken as a whole, the Lanham Act, enacted in 1946 and overhauled in 1988, is primarily intended to provide a statutory framework for the registration and protection of trademarks for goods and services, and, to that end, "to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce." 15 U.S.C. § 1127. But trademarks are not the Lanham Act's only concern. An important cognate statutory purpose is "to protect persons engaged in such commerce against unfair competition." *Ibid.*

With a view to aiding in the achievement of these statutory goals, Section 43(a) of the Lanham Act as enacted in 1946 provided as follows:

> *Any person who shall* affix, apply, or annex, or *use in connection with any goods or services,* or any container or containers for goods, a false designation of origin, or *any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such* designation of origin or *description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action* by any person doing business in the locality falsely indicated as that of origin or in the region in which said

locality is situated, or *by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.*

15 U.S.C.A. § 1125(a) (1982) (emphasis added). Section 39 of the Lanham Act vested subject-matter jurisdiction in the federal courts over causes of action created by the Lanham Act: "The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States shall have appellate jurisdiction, of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties." 15 U.S.C.A. § 1121 (1982).

As recast in 1988, Section 43(a) was broken down into two subsections: subsection 1 authorizes "any person who believes that he or she is or is likely to be damaged by such acts" to bring a civil action against anyone who:

> ... on or *in connection with any goods or services,* or any container for goods, *uses in commerce* any term, name, symbol or device, or any combination thereof, or *any* false designation of origin, *false or misleading description of fact, or false or misleading representation of facts, which*
>
> (1) is likely to cause confusion ... as to the affiliation ... of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (2) *in commercial advertising or promotion, misrepresents the nature, characteristics, qualities,* or geographic origin *of his or another person's goods, services, or commercial activities....*

15 U.S.C. § 1125(a) (emphasis added). Section 39—the jurisdictional provision—remained essentially unchanged.

In dismissing plaintiff-appellants' claims, the two district courts did not challenge the submission—which seems, indeed, indisputable—that the underscored portion of the quoted language of the current version of Section 43(a) is, as a matter of syntax, suffi-

ciently broad to accommodate consumer claims. Rather, the district courts concluded, on the basis of case law with which the meager legislative history was not in disaccord, that the false advertising aspects of Section 43(a)—as originally framed in 1946 and as revised in 1988—were calculated to protect competitors or others with a comparably integral commercial interest but did not include ultimate consumers within the scope of protected interest. Since we agree with the holdings of the district courts, we will affirm their judgments.

In part I of this opinion, we describe in somewhat more detail the claims made and proceedings had in the district courts. In part II of this opinion we identify and discuss the relevant precedents. In part III we explain why, in our judgment, the rulings of the two district courts were correct.

### I.

*Serbin v. Ziebart*, No. 92–3689

Plaintiffs Sara G. Serbin and George Baker brought suit in the United States District Court for the Western District of Pennsylvania against Ziebart International Corporation and Ziebart Corporation. Ms. Serbin and Mr. Baker alleged in their joint complaint that, each of them, in 1990, contemporaneously with buying a new automobile, bought from the defendants (hereinafter collectively referred to as "Ziebart") Ziebart's so-called "Super Rust Protection" policy which insured against the rusting of newly purchased automobiles. The plaintiffs further alleged that Ziebart's advertisements of the "Super Rust Protection" policy contained representations that the Ziebart policy provided lifelong protection substantially more comprehensive than that contained in standard new-automobile manufacturers' warranties. These representations, according to the complaint, were false and known by Ziebart to be so. Plaintiffs alleged that, at least since 1988, standard warranties covering automobiles of the type purchased by the plaintiffs and similar warranties covering other brands of automobiles, American and foreign, sold in the United States, have provided multi-year, or 100,000 mile, protection against rusting fully as comprehensive as that provided by the lifelong Ziebart policy. Also, plaintiffs alleged that the Ziebart advertisements described the Ziebart policy in more expansive terms than the actual recitals of coverage set forth in the text of the policy.

Contending that they had been misled by Ziebart's advertisements into spending money on a policy "duplicative" of the protection afforded at no additional cost by automobile manufacturers during the life of the factory warranties, plaintiffs pleaded two causes of action—a federal claim under Section 43(a) of the Lanham Act, and a pendent state claim under the Pennsylvania Consumer Protection Act, 73 P.S. §§ 201–2(4)(v–vii). Plaintiffs also sought class certification on behalf of "all persons ... who purchased Ziebart 'Super Rust Protection' in connection with the purchase of a new motor vehicle...."

Ziebart moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Judge Bloch granted the motion. In a thoughtful opinion which reviewed the case law of Section 43(a) in some detail, Judge Bloch held that plaintiffs had failed to state a claim under the Lanham Act. Moreover, since the complaint did not state a valid federal claim, Judge Bloch concluded that the proper course was to dismiss the state claim as well, without prejudice to its reassertion in a state court.

Judge Bloch's dismissal of the Lanham Act claim rested on his conclusion that the injuries complained of by plaintiffs were not within the zone of interests sought to be protected by Section 43(a)'s ban on false advertising:

> Although a consumer may bring an action under § 43(a) of the Lanham Act, that consumer must show a commercial interest which is subject to an injury because of the Lanham Act violation. *See Ditri v. Coldwell Banker*, 954 F.2d 860 [869] 872 (3d Cir.1992) ("In an action under § 43(a), plaintiffs must allege in their complaint ... that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc."). That commercial interest which is subject to injury need not be in direct competition with the alleged perpetrator's commercial interest, [*Thorn*

*v. Reliance Van Co., Inc.*, 736 F.2d 929, 933 (3d Cir.1984) ], but there must be some reasonable and cognizable commercial interest which has been or potentially will be injured by the Lanham Act violation, *Ditri*, 954 F.2d at 872 (footnote omitted).

*Guarino v. Sun Company, Inc.*, No. 93–5321

Plaintiff Sheilah Guarino brought suit in the United States District Court for the District of New Jersey against defendants Sun Company, Inc., Sun Refining & Marketing Company, and Wells, Rich, and Greene Inc. The gravamen of the complaint was that plaintiff had purchased Sun Company's highest octane gasoline, Sunoco Ultra, in reliance on defendants' advertising claims that Ultra provided more power and quicker acceleration than gasolines of lower octane and lesser cost—claims known by defendants to be false—and had thus been induced to spend money on a gasoline of premium price that did not enhance performance. The suit, which plaintiff sought to frame as a class action on behalf of "[a]ll persons in the United States who purchased Ultra gasoline from April 1, 1990 through the date of class certification," invoked federal jurisdiction on the basis of Section 43(a) of the Lanham Act; the complaint also alleged certain pendent state law claims.

Defendants moved for summary judgment under Federal Rule of Civil Procedure 56(c). Judge Irenas granted the motion, 819 F.Supp. 405. Judge Irenas carefully reexamined the materials canvassed by Judge Bloch in *Serbin* and reached the same result: "... [W]e agree with the court's conclusion in *Serbin* ... that plaintiffs solely as consumers are 'devoid of any existing or potential commercial interest,' and do not have standing under § 43(a)." Judge Irenas added that "[t]o accept plaintiff's argument would be to convert the Lanham Act from a regulation of commercial interests and unfair competition to a catchall consumer protection statute that could apparently be used to challenge any allegedly misleading advertising. While such an expansion of the Act's coverage may be desirable,[1] that is for Congress, not this court, to decide."

## II.

The Lanham Act, enacted in 1946, recast and codified in a single piece of legislation the various antecedent federal statutes dealing with trademarks and related matters. Section 43(a) of the 1946 Act (from which the 1988 version of Section 43(a), the provision at issue in these two consolidated appeals, derives) was an enlargement of Section 3 of the Trademark Act of 1920.

Section 3 of the 1920 Act provided "[t]hat any person who shall willfully and with intent to deceive ... use in connection with any ... articles of merchandise ... a false designation of origin ... and shall then cause such merchandise to enter into interstate or foreign commerce ... shall be liable to an action at law ... and ... in equity ... at the suit of any person, firm, or corporation doing business in the locality falsely indicated as that of origin...."[2] Section 3 "was ... deemed to be a 'dead letter,' due principally

---

**1.** In a footnote, Judge Irenas observed:

The court is aware that some commentators have argued in favor of consumer standing either as a matter of judicial interpretation or legislative clarification. *See, e.g.,* Arthur Best, *Controlling False Advertising: A Comparative Study of Public Regulation, Industry Self-Policing, and Private Litigation,* 20 *Ga.L.Rev.* 1, 66–68 (Fall 1985); *See also False Advertising Claims and the Revision of the Lanham Act: A Step in Which Direction?,* 59 *U.Cin.L.Rev.* 957, 960–67 (Winter 1991).

**2.** The full text of Section 3 was:

That any person who shall willfully and with intent to deceive, affix, apply, or annex, or use in connection with any article or articles of merchandise, or any container or containers of the same, a false designation of origin, including words or other symbols, tending to falsely identify the origin of the merchandise, and shall then cause such merchandise to enter into interstate or foreign commerce, and any person who shall knowingly cause or procure the same to be transported in interstate or foreign commerce or commerce with Indian tribes, or shall knowingly deliver the same to any carrier to be so transported, shall be liable to an action at law for damages and to an action in equity for an injunction, at the suit of any person, firm, or corporation doing business in the locality falsely indicated as that of origin, or in the region in which said locality is situated, or at the suit of any association of such persons, firms, or corporations.

to the requirement of proof of wilfulness or intent to deceive, a defect corrected by successor draft bills and ultimately by § 43(a)." *Colligan v. Activities Club of New York,* 442 F.2d 686, 690 n. 14 (2d Cir.1971). Section 43(a) of the 1946 Act not only discarded the wilfulness/intent-to-deceive ingredients, it also occupied territory broader than false designations of origin. The new statute provided that "[a]ny person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin ... or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." 60 Stat. 427, 441.

When enacted Section 43(a) appears to have made little impress on the bar; in the years immediately following its adoption, the new provision seldom went to court. The first significant appellate construction of Section 43(a) was this court's 1954 decision in *L'Aiglon Apparel v. Lana Lobell, Inc.,* 214 F.2d 649 (3d Cir.1957).[3] There, a dress manufacturer sued a dress retailer, alleging that the retailer had, in advertisements of a dress the retailer was selling for $6.95, used a photograph of a dress plaintiff was marketing for $17.95. Invoking the Lanham Act, plaintiff alleged that defendant's use of the photograph of plaintiff's dress resulted in potential purchasers of plaintiff's more expensive dress (1) buying defendant's dress instead, or (2) not purchasing plaintiff's dress in the belief that it was only worth $6.95, not $17.95. The district court dismissed on dual grounds: lack of jurisdiction, since diversity of citizenship was not alleged; and failure to state a cause of action.

41 Stat. 533, 534.

**3.** In 1956, Chief Judge Clark of the Second Circuit pointed to *L'Aiglon,* with approval, as the principal judicial discussion of Section 43(a), and observed that "the bar has not yet realized the potential impact of this statutory provision." *Maternally Yours v. Your Maternity Shop,* 234

This court, speaking through Judge Hastie, reversed.

With respect to jurisdiction, Judge Hastie pointed out that Section 43(a) defined a relevant cause of action and that Section 39 vested jurisdiction in the federal courts over all causes of action arising under the Lanham Act. Turning to the question whether the complaint stated a cause of action, Judge Hastie acknowledged that two federal courts had read Section 43(a) as merely a statutory codification of the federal common law unfair competition doctrine first enunciated in *American Washboard Co. v. Saginaw Mfg. Co.,* 103 F. 281 (6th Cir.1900), that limited false representation claims to those that demonstrably involved "'[p]alming off'"—i.e., "confusion of plaintiff's and defendant's goods." 214 F.2d at 651.[4] Judge Hastie rejected this narrow reading of Section 43(a):

We find nothing in the legislative history of the Lanham Act to justify the view that this section is merely declarative of existing law. Indeed, because we find no ambiguity in the relevant language in the statute we would doubt the propriety of resort to legislative history even if that history suggested that Congress intended less than it said. It seems to us that Congress has defined a statutory civil wrong of false representation of goods in commerce and has given a broad class of suitors injured or likely to be injured by such wrong the right to relief in the federal courts. This statutory tort is defined in language which differentiates it in some particulars from similar wrongs which have developed and have become defined in the judge made law of unfair competition. Perhaps this statutory tort bears closest resemblance to the already noted tort of false advertising to the detriment of a competitor, as formulated by the American Law Institute out of materials of the evolving common law of unfair competition. *See* Torts Restatement, Section 761, *supra.* But however

F.2d 538, 546 (2d Cir.1956) (Clark, C.J. concurring).

**4.** Of course, the *American Washboard* jurisprudence originated and flourished decades before the court's pronouncements in *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) that "there is no general federal common law."

similar to or different from pre-existing law, here is a provision of a federal statute which, with clarity and precision adequate for judicial administration, creates and defines rights and duties and provides for their vindication in the federal courts. For illuminating discussions of Section 43(a) and its relation to precedent law, see Callmann, False Advertising as a Competitive Tort, 1948, 48 Col.L.Rev. 876, 877–886; Bunn, The National Law of Unfair Competition, 1949, 62 Harv.L.Rev. 987, 998–1000. 214 F.2d at 651.

The two articles referred to by Judge Hastie as "illuminating discussions of Section 43(a)" are noteworthy.

The first article, published in 1948, was by Rudolph Callmann, the author of the treatise whose three-volume first edition—*Unfair Competition and Trade–Marks*—had appeared in 1945, a year before the enactment of the Lanham Act. Mr. Callmann's article, entitled *False Advertising as a Competitive Tort,*[5] deplored *American Washboard,* acknowledged that its "doctrine ... appears to be too deeply embedded in the law to expect that it will be judicially reexamined,"[6] and then expressed disappointment that the Second Circuit's first attempt to probe the very recently enacted Section 43(a) had linked it to the prior case law rather than "welcoming the new law and using its language and sweep as a basis for by-passing an unhappy precedent...." Mr. Callmann went on to observe:

> The present writer has previously stated that "Unlawful competition is a tort *sui generis,* a violation of the order of struggle, an injury to the right of every competitor to require that his competitors act in conformity with the rules of competition. Competition is a relationship with mutual rights and liabilities and the duty to act in harmony with the rules of competition is an affirmative obligation." This means lit-

erally that "every competitor" is injured and therefore, that every competitor has a cause of action. The language of the Lanham Act is in complete harmony with this position, for it states that the wrongdoer in cases of false advertising is "liable to a civil action ... by *any person* who believes that he is or is likely to be damaged by the use of any such false description or representation."[7]

The second article, entitled *The National Law of Unfair Competition,* was by Professor Charles Bunn.[8] A principal theme of the article was that, if only federal courts had in years past been pressed to read the Federal Trade Commission Act a little more empathetically, that statute would have turned out to be a charter of national unfair competition law and there would have been no need to enact Section 43(a). As it was, Section 43(a) was "a marked enlargement"[9] of Section 3 of the Trade Mark Act of 1920.[10] "Quite clearly the Congressional intention was to allow a private suit by a competitor to stop the kind of unfair competition that consists of lying about goods or services, when it occurs in interstate commerce."[11] Professor Bunn concluded his discussion of Section 43(a) in the following words:

> Let us say that a concern makes lumber from ponderosa pine and sells it interstate as "white pine lumber." It is engaging in an unfair method of competition in commerce which damages the public, and the FTC has authority to stop it. But if the Commission failed to act, the sellers of genuine white pine lumber were formerly held to have no remedy in court, even under the pre-*Erie* law. Under the Lanham Act they have an action, since, clearly, they are likely to be damaged by the illegal competition. If they can show that the illegal competition is continuing, they should have an injunction. For the defendant's conduct is illegal by force of federal

---

**5.** 48 *Colum.L.Rev.* 876 (1948).

**6.** *Id.* at 885.

**7.** *Id.* at 886.

**8.** Bunn, *The National Law of Unfair Competition,* 62 *Harv.L.Rev.* 987 (1949).

**9.** *Id.* at 998.

**10.** See *supra* note 2.

**11.** 62 *Harv.L.Rev.* at 999.

law, and damages are inadequate because no particular competitor can prove particular lost sales. There is no real reason to require the FTC to spend public money to proceed against trade liars if private competitors are willing to take on the job.[12]

In 1971, a quarter-century after the enactment of the Lanham Act, the Second Circuit, in *Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, *cert. denied*, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971), addressed the question whether a customer who alleged damages flowing from the false advertising of a purveyor of goods or services has stated a viable cause of action under Section 43(a). The issue posed in *Colligan* was, said Judge Moore, "one of first impression for this and apparently any federal court." *Id.* at 688. The arguments in favor of such a claim were advanced in a sympathetic setting: The plaintiffs were two Long Island high school students. The defendants had, according to the complaint, advertised a ski-weekend in Massachusetts; proper equipment, qualified instruction, safe and certified transportation, and all meals—a package tour for $44.75 a head—were to be supplied. One-hundred-fifty-three students at Hempstead's Sacred Heart Academy signed up. The weekend was a fiasco—there weren't enough skis, only one member of the staff was a qualified ski instructor, buses broke down and were unsafe, etc. The two plaintiffs sued not only on their own behalf but as representatives of (a) their 151 fellow students and (b) all other New York-area high school students who might be similarly deceived. The complaint invoked Section 43(a) and Section 39's grant of federal question jurisdiction with respect to Lanham Act claims. The district court dismissed for failure to state a cause of action.

On appeal, relying on the language of Section 43(a) creating a cause of action in favor of "any person who believes that he is or is likely to be injured by use of any such false representation or description," appellants' counsel presented the case for reversal in what Judge Moore described as "an able brief, which sets forth the issues with beguiling simplicity...." 442 F.2d at 687.[13] "Appellants' principal contention [was] that the language of § 43(a), specifically the term 'any person,' is so unambiguous as to admit of no other construction than that of permitting consumers the right to sue under its aegis." *Id.* at 689. "It is further suggested that if Congress had desired, it could and would have limited or narrowed the class of protected plaintiffs to commercial parties merely by saying so. We reject this line of maxims of statutory construction in favor of Judge Learned Hand's more practical instruction that '[w]ords are not pebbles in alien juxtaposition,' and therefore turn first to § 43(a)'s legislative history." *Ibid.* (footnote omitted).

Judge Moore's assessment of the legislative history—much of it "ancient history," *id.* at 690—is set forth in the margin.[14] Suffice

---

12. *Id.* at 1000.

13. Appellees filed no brief on appeal.

14. Judge Moore's opinion states in part:

> We agree with appellants that "[t]he Lanham Act of 1946 has a very long and convoluted legislative history," which with respect to § 43(a) we find to be inconclusive and therefore of little or no help in resolving the issue decided today. We are cited by counsel to certain statements, actions and inactions and are asked to make certain causal connections among them and then to draw a set of preferred inferences therefrom. Counsel lay stress, for example, on the following statement made before a joint congressional committee in 1925 by a representative of the U.S. Trademark Association with respect to the language of a bill's provision, which, in substantially modified form, became § 43(a):

> "It provides that any person who is damaged by the false description may start the suit. Obviously the purchaser might claim that he has been misled and damaged and start suit. At any rate, if it is intended to limit the right to start such a suit, that limitation should be stated."

> None of the committee members or draftsmen of § 30 of the 1925 bill expressed any disagreement with this statement, and the provision remained unchanged, containing no express limitation barring consumer suits.

> We are asked to conclude from this ancient history that the committee's silence, followed by its inaction with respect to amending this portion of the bill, must mean that Congress clearly intended to create standing for consumers under the 1946 Act. On this flimsy record, it would be self-serving for us to invoke the doctrine of "silence as acceptance" as a basis upon which to draw any consequential inference with respect to § 43(a)'s legislative histo-

it to say, Judge Moore and his colleagues were not persuaded that the legislative history supported what appellants insisted was the unambiguous meaning of Section 43(a):

> The congressional statement of purpose of the Act is contained in § 45, which in pertinent part states: "The intent of this chapter * * * is to protect persons engaged in such commerce against unfair competition." In this, the only phrase referring to the class of persons to be protected by the Act, as defined by their conduct and the source of the injuries sought to be protected against, no mention at all is made of the "public" or of "consumers." The legislative history of the Act, such as it is, add nothing. We do know to a reasonable certainty, however, that the consumer protection explosion and the wholesale displacement (though not preemption) of traditional state statutory and common law remedies—matters pregnant with manifold consequences of great importance—were never considered or foreseen by Congress prior to the enactment of § 43(a). We conclude, therefore, that Congress' purpose in enacting § 43(a) was to create a special and limited unfair

competition remedy, virtually without regard for the interests of consumers generally and almost certainly without any consideration of consumer rights of action in particular. The Act's purpose, as defined in § 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct.[15]

Judge Moore found confirmation for the foregoing analysis in Judge Hastie's opinion for this court in *L'Aiglon*. "As the [*L'Aiglon*] court noted, although § 43(a) was intended to create a federal unfair competition count, since 'the Lanham Act was not intended to bring all unfair competition within federal jurisdiction,' it was intended to be a special, limited one covering all those cases in which false description and/or false designation of origin was alleged. Since Congress deliberately excluded from coverage virtually all categories of unfair competition but for false advertising, it could not have intended to create a whole new body of substantive law completely outside the substantive scope of unfair competition." *Id.* at 692–93 (footnotes omitted).[16]

---

ry. We believe it more likely that the committee members evidenced no disagreement or agreement with the interpretation given § 30 by the above-quoted statement because neither was necessary; the committee members probably were sufficiently confident of their own interpretation that they felt that no clarification by way of reply and/or amendment was needed to implement their intention to confer standing solely upon commercial plaintiffs.

It is also suggested that since the statutory predecessor of § 43(a), § 3 of the Trademark Act of 1920, was addressed solely to the prohibition of false designations of origin and authorized suit only by persons, corporations, etc., "*doing business* in the locality falsely indicated as that of origin" and since this type of language was preserved in several early drafts of what became § 43(a) but was ultimately dropped by the A.B.A. Trade–Mark Committee in favor of a provision permitting suit by "any person, firm or corporation who is or is likely to be damaged by the use of any false description or representation," we should conclude that the A.B.A. rejection of the earlier colorably broader A.B.A. language "clearly indicates an intent [attributable to Congress] not to restrict the provision to actions by businessmen and tradesmen," and "a [congressional] concern to expand the class and type of person authorized to sue." We, on the other hand,

construe the deletion of the phrase "in his trade or business" from the earlier A.B.A. drafts to be equally consistent with a clearly expressed congressional purpose to create a federal statutory tort of unfair competition *sui generis*, thus rendering the subject phrase to the status of mere surplusage.
442 F.2d at 689–691 (footnotes omitted).

**15.** 442 F.2d at 691–92 (footnotes omitted).

**16.** The Second Circuit decided *Colligan* on May 6, 1971. On October 6, 1971, a district court in California, in denying a motion to dismiss, held in *Arnesen v. Raymond Lee Organization, Inc.*, 333 F.Supp. 116 (C.D.Cal.1971), that a consumer who alleged damages flowing from false advertising had stated a claim under Section 43(a). The court in *Arnesen* rejected the contention that the statute "confers no private right of action on a defrauded customer but only on competitors...." *Id.* at 119. "The liability clause of Section 43(a) is clear on its face; it applies to any person who is or is likely to be damaged. Defendant would have us construe against the plain language of the statute." *Id.* at 120. The court did not discuss—indeed, it did not cite—*Colligan*.

The *Arnesen* complaint included counts other than the Section 43(a) count; accordingly, the *Arnesen* opinion, in addition to parsing Section

*Colligan in the Law Reviews and Treatises*

The decision in *Colligan* quickly became a focus for debate among the academic commentators. Law review note and comment writers were divided. Compare 46 *N.Y.U.L.Rev.* 807 (1971) ("The decision of the court in *Colligan* appears to present a perfect illustration of judicial conservatism," *Id.* at 811) and 72 *Colum.L.Rev.* 182 (1972) ("[S]tanding issue [resolved] in a manner ... arguably ... not dictated by the language, legislative history or underlying policy of the statute, and that may have been at variance with the best interests of the general public." *Id.* at 191), with 3 *Rutgers–Camden L.J.* 583, 590 (1972) ("In light of the legislative history, together with subsequent judicial interpretation, it was not unwarranted for the court to hold as it did." *Id.* at 590. However, "[i]t is strongly urged ... that Congress in amending Section 43(a) provide consumers with a comprehensive remedy against false advertising." *Id.* at 591). More senior scholars also had discrepant assessments of *Colligan.* Professor J. Thomas McCarthy felt that the Second Circuit's "restrictive reading of § 43(a) is both bad policy and improper judicial interpretation of clear statutory language." 2 *J. Thomas McCarthy, Trademarks and Unfair Competition* § 27.5 (1973). But Professor Walter J. Derenberg praised Judge Moore's "well-reasoned opinion," Derenberg, *The Twenty-fifth Year of Administration of the Lanham Trademark Act of 1946,* 62 *Trade–Mark Rep.* 393, 495 (1972) which "limit[ed] Section 43(a), quite properly, to commercial competitors rather than to 'any person'..." *Id.* at 494.[17]

*The Case Law After Colligan*

Over the past two decades *Colligan* has been an important focus for the developing case law of Section 43(a). *See, e.g., Smith v. Montoro,* 648 F.2d 602, 608 (9th Cir.1981); *Dovenmuehle v. Gilldorn Mort'g. Midwest Corp.,* 871 F.2d 697, 700 (7th Cir.1989); *Sandoz Pharmaceuticals v. Richardson–Vicks, Inc.,* 902 F.2d 222, 230 (3d Cir.1990).

*Ninth Circuit Case Law:*

*Colligan* served as a point of departure for a particularly interesting series of Ninth Circuit Section 43(a) cases. The first of these cases was *Smith v. Montoro,* a suit alleging that (1) the plaintiff, Paul Smith, had acted in a movie under a production contract guaranteeing Smith star billing in the screen credits and advertising, (2) the producer licensed defendants to distribute the movie in the United States, and (3) the defendants then substituted the name of another actor for the plaintiff's name in the screen credits and in the advertising. Smith's invocation of federal question jurisdiction was predicated on Section 43(a). The district court dismissed for failure to state a cognizable claim. According to the district court, Section 43(a) was "limited in its scope and intent to merchandising practices in the nature of, or economically equivalent to, palming off one's goods as those of a competitor, and/or misuse of trademarks and trade names." Smith's suit, the district court ruled, did not fall within the statute: "There is certainly in this case no intent to divert a competitor's business by misleading consumers. Plaintiff's claim is not that his name was misused, but

43(a), addressed other issues not pertinent to our present inquiry. Several years after the denial of the motion to dismiss the Section 43(a) claim, the court entered a default judgment against defendants on that claim. *Jones v. The Raymond Lee Organization, Inc.,* 209 USPQ 209, 212 (C.D.Cal.1949).

**17.** And see, Germain, *Unfair Trade Practices Under Section 43(a) of the Lanham Act: You've Come a Long Way, Baby—Too Far Maybe?,* 49 *Ind.L.J.* 84, 106–08 (1973):

In the recent *Colligan* case, the Second Circuit construed § 43(a) in light of the legislative intent that could be gleaned from the language of the Act itself and inferred from the common law underlying the Act, rather than relying on legislative history that is "very long and convoluted." It is submitted that this approach and the resulting conclusions were correct, even though the effect may have been to deny an aggrieved party a feasible route to relief." *Id.* at 106 (footnote omitted)....

"The upshot of the court's analysis is that § 43(a) was intended by Congress *primarily* to ameliorate competitive abuses and only incidentally to benefit broader public or "consumer" interests. This view is buttressed by the fact that the law of unfair competition and trademarks in general actually functions in this manner. Notwithstanding the oft-expressed concern for public interest, the law's evolution has been restricted almost entirely to commercial plaintiffs." *Id.* at 108–09 (footnotes omitted) (emphasis in original).

that it wasn't used at all." 648 F.2d at 603. The district court also expressed doubt that Smith had standing to sue under Section 43(a) since he "was not in any sort of competition with the defendants." *Id.* at 607. The appellate court reversed, holding that (1) Section 43(a) covered what the court characterized as *"express reverse passing off," Ibid.* (emphasis in original), and (2) Smith was an injured "person" within the meaning of Section 43(a) and hence had standing. The court explicated its ruling on standing as follows:

> The Second Circuit has ruled that section 43(a) does not give standing to consumers. *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). This reading of section 43(a) has been sharply criticized. *See,* e.g., 2 J. McCarthy, *supra,* § 27:5. At any rate, however, it is clear that appellant, as one in the business of providing his talents for use in the creation of an entertainment product, is uniquely situated to complain of injury resulting from a film distributor's misidentification of appellant's contribution to the product. According to one commentator, the "dispositive question" as to a party's standing to maintain an action under section 43(a) is whether the party "has a reasonable interest to be protected against false advertising." 1 R. Callmann, *supra,* § 18.2(b), at 625 (3d ed. 1967). *See also New West Corp. v. NYM Co. of Calif., Inc.,* 595 F.2d 1194, 1198 (9th Cir.1979). The vital interest of actors in receiving accurate credit for their work has already been described. Accordingly, we hold that appellant has standing to sue in federal court based on defendants' alleged violation of section 43(a).

*Id.* at 608.

*Smith* was followed by *Halicki v. United Artists Communications, Inc.,* 812 F.2d 1213 (9th Cir.1987). *Halicki* was a suit under Section 43(a) brought by a movie producer against a distributor and certain theaters alleging that the defendants, contrary to their agreement to advertise the movie under the "PG" rating assigned by the Motion Picture Association, advertised the movie—falsely—under the more restrictive "R" rating, with the result that audiences were smaller than they would have been had the advertising rating been accurate. The district court granted summary judgment for the defendants. The Ninth Circuit affirmed. The court acknowledged that, if *Smith v. Montoro* and an analogous Second Circuit case, *Gilliam v. American Broadcasting Co.,*[18] "are extended, Halicki has made out a plausible case." 812 F.2d at 1214. This would be especially true "if we should read 'competition' in the Lanham Act in the Pickwickian way it is suggested that the term has already been read in relation to trademarks. See McCarthy, *Trademarks and Unfair Competition,* 1984 ed. § 24.4B." However, said the court:

> The statute does not permit us to accept Halicki's invitation.... The statute is directed against unfair competition. To be actionable, conduct must not only be unfair but must in some discernible way be competitive....
>
> If Section 43(a) is not confined to injury to a competitor in the case of a false designation, it becomes a federal statute creating the tort of misrepresentation, actionable as to any goods or services in commerce affected by the misrepresentation. As one treatise suggests, the Lanham Act then would be similar to French, German and Swiss law where, by virtue of a general code clause, in any suit in tort or contract the violation of good morals may become an issue. Broadening the Act from unfair competition to unfair trade "is equivalent" to the complete dilution of the concept of unfair competition. *Callmann, Unfair Competition, Trademarks and Monopolies,* (1981 ed., 1986 supp.) § 209.
>
> Adhering to the statutory language, we do not find conduct actionable under Section 43(a).

812 F.2d at 1214.

The apparent tension between *Smith v. Montoro* and *Halicki v. United Artists Communications, Inc.* was addressed by the

---

**18.** 538 F.2d 14 (2d Cir.1976) (claim by "Monty Python" group that broadcast by American Broadcasting Company excised much of Monty Python's "rare brand of humor," to detriment of group's reputation, cognizable under Section 43(a) notwithstanding no competitive relationship between Monty Python and ABC).

Ninth Circuit in *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093 (9th Cir.1992). Tom Waits, a singer of some celebrity, brought suit under Section 43(a) against an advertising agency and its client, Frito–Lay, for having created and arranged to broadcast a radio commercial for Salsa Rio Doritos "which featured a vocal performance imitating Waits' raspy singing voice." *Id.* at 1096. The case went to trial and the jury returned a substantial verdict for plaintiff. The appellate court affirmed. In its opinion, the court recognized that *Halicki v. United Artists Communications, Inc.* and *Smith v. Montoro* seemed to point in opposite directions—*Halicki* towards, and *Smith* away from, a requirement of competition between plaintiff and defendant as a defining ingredient of a Section 43(a) claim. The *Waits* court resolved the difficulty as follows:

> We find that *Smith* and *Halicki* may be reconciled, and we begin with the basic principle embody; that standing under section 43(a) exists where the interest asserted by the plaintiff is a commercial interest protected by the Lanham Act.

> Its drafters wrote the purposes of the Lanham Act, two of which are relevant here, into the statute itself: to make "actionable the deceptive and misleading use of marks in . . . commerce" and "to protect persons engaged in . . . commerce against unfair competition." 15 U.S.C. § 1127 (1988). Section 43(a) reflects both of these purposes, providing two bases of liability: (1) false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ("false association"), and (2) false representations in advertising concerning the qualities of goods or services ("false advertising"). *See, e.g.,* 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* §§ 27:2–27:4, at 344–68 (2d ed. 1984) (discussing two prongs of section 43(a)); *U–Haul Int'l, Inc. v. Jartran, Inc.,* 681 F.2d 1159, 1160 (9th Cir. 1982) (discussing trademark infringement and false comparative advertising as two distinct causes of action under § 43(a)); *Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 532 F.Supp. 1203, 1220 (S.D.N.Y.) (discussing false association and

false advertising), *rev'd on other grounds,* 689 F.2d 1127 (2d Cir.1982). *Halicki* and *Smith* are distinguishable, because they involve different prongs of section 43(a) liability. and implicate distinct interests. *Cf. Halicki,* 812 F.2d at 1214 (distinguishing *Smith* on the basis of type of claim asserted).

> We have recognized that simple claims of false ·representations in advertising are actionable under section 43(a) when brought by competitors of the wrongdoer, even though they do not involve misuse of a trademark. *See U–Haul,* 681 F.2d at 1160–61. The plaintiff's claim in *Halicki* was exclusively such a "false advertising" claim, for it sought redress for a simple misrepresentation as to a product's quality, the content of a movie. We were at pains to point out that the plaintiff's injury was not related to the Lanham Act's purpose of preventing the "deceptive and misleading use of marks," 15 U.S.C. § 1127, declaring that the statute's purposes with regard to the use of trademarks were irrelevant to his claim. *See Halicki,* 812 F.2d at 1214. Rather, where the misrepresentation simply concerns a product's qualities, it is actionable under section 43(a) only insofar the Lanham Act's other purpose of preventing "unfair competition" is served.

> . . . .

> The plaintiff's claim in *Smith,* on the other hand, was a type of false association claim stemming from the misuse of a mark, for it alleged the wrongful removal of the plaintiff's name and the wrongful substitution of another's name. *Smith* teaches that where such a claim is presented, the plaintiff need not be a competitor, for the Lanham Act also grants a cause of action to certain noncompetitors who have been injured commercially by the "deceptive and misleading use of marks." . . . Those with standing to bring such a claim include parties with a commercial interest in the product wrongfully identified with another's mark, as in *Smith,* ·or with a commercial interest in the misused mark.

978 F.2d at 1108–09 (footnotes omitted).

*Third Circuit Case Law:*

This court has voiced what is perhaps the sharpest judicial criticism of *Colligan.* In

*Thorn v. Reliance Van Company, Inc.*, 736 F.2d 929 (3d Cir.1984), plaintiff Philip Thorn owned forty-five per cent of the stock of Florida–Eastern U.S. Van Lines, an interstate trucking company specializing in the transport of household goods that went bankrupt. Alleging that Florida–Eastern's financial difficulties were precipitated by false advertising in the yellow pages placed by Reliance Van, a competitor trucking company controlled by certain of plaintiff's own fellow directors, Thorn sued in a federal district court, relying on a claim under Section 43(a) as the basis for federal jurisdiction and also pleading various state law claims. The district court, noting that the trustee in bankruptcy had declined to bring suit, dismissed Thorn's Section 43(a) suit for lack of standing. This court reversed:

> The traditional plaintiff under section 43(a) has been a competitor who was injured in his line of business as a result of the false advertising.... Thorn, however, in his capacity as an officer, director and shareholder of Florida–Eastern was not a competitor of Reliance. The question then is whether Thorn as an investor falls within the class of *non-competitors* entitled to bring an action....
>
> Under a plain meaning interpretation of section 43(a) it is this court's function to grant standing to Thorn if he is a person who believes that he has been damaged by Reliance's use of false representations ... In *Colligan*, the Second Circuit held that consumers could not maintain a class action under section 43(a) of the Lanham Act. 442 F.2d at 689. Although the court acknowledged that a plain meaning interpretation of that section would permit consumers to sue under the statute, the court reasoned that congressional intent, as evidenced in section 45 of the Act, limited protection to interests of "a purely commercial class against unscrupulous commercial conduct." *Id.* at 692. The primary reason articulated for denying consumer standing was that an expansive reading would further flood the already overcrowded federal courts. *Id.* at 693.
>
> We reject the *Colligan* decision to the extent that it is contrary to the plain meaning rule as set out by the Supreme Court in *Caminetti v. United States*, 242 U.S. [470] at 485, 37 S.Ct. [192] at 194 [61 L.Ed. 442 (1917) ] and *Aloha Airlines, Inc. v. Director of Taxation of Hawaii*, [464] U.S. [7] at [11–12], 104 S.Ct. [291] at 294 [78 L.Ed.2d 10 (1983) ].

736 F.2d at 931–32 (footnotes omitted).

Having "reject[ed] the *Colligan* decision to the extent that it is contrary to the plain meaning rule," this court went on to point out that, on its facts, *Thorn* lay outside the purview of *Colligan*:

> In any event, the instant case is readily distinguishable from *Colligan* since Thorn seeks standing not as a consumer, but instead as an investor in a bankrupt corporation controlled by individuals who allegedly conspired to injure that corporation through false advertising.

736 F.2d at 933.

Finally, this court addressed the question "whether there are any prudential reasons," *ibid.*, for denying standing to Thorn:

> Having concluded that the plain language of the statute gives Thorn, a non-competitor, the right to sue for harm caused by the false representation of services in commerce, we believe that "the 'dispositive question' as to a party's standing to maintain an action under section 43(a) turns on whether the party 'has a reasonable interest to be protected against false advertising.'" *Smith v. Montoro*, 648 F.2d at 608, quoting 1 R. Callmann, *Unfair Competition Trademarks and Monopolies*, § 18.2(b) at 625 (3d ed. 1967). The Ninth Circuit adopted a prudential requirement that the party seeking standing under section 43(a) must demonstrate a "reasonable interest" to be protected under the statute. This requirement would eliminate frivolous claims and prevent flooding the federal courts with Lanham Act claims contrary to the type envisioned by Congress.
>
> In this case, we find that Thorn in his capacity as an investor has alleged sufficient direct injury resulting from the false advertisements of the defendants and through these allegations has demonstrat-

ed a reasonable interest to be protected under section 43(a).

*Ibid.*

The "sufficient direct injury" alleged by Thorn was that his investment in Florida–Eastern was destroyed by the misconduct of one of Florida–Eastern's chief competitors. Thus, this court's determination that the plaintiff in *Thorn* had "a reasonable interest to be protected under section 43(a)" permitted a false advertising suit by one who, while not in his own person a competitor of the alleged rogue enterprise, was, nonetheless, so situated that he could quite reasonably be regarded as a surrogate for such competitor.[19]

No decision of this court since *Thorn* has broadened the class of false advertising claims cognizable under Section 43(a).[20] One case—*Ditri v. Coldwell Banker,* 954 F.2d 869 (3d Cir.1992)—appeared to present the question whether a purchaser of professional services could sue under section 43(a). "...[P]laintiffs contend[ed] that they [had] standing, as non-competitors, to assert a claim under section 43(a) based on the plain meaning analysis of that section expounded in *Thorn* ..." *Id.* at 872. However, concluding that the representations complained of did not constitute false advertising within the meaning of the statute, the court in *Ditri* found it "unnecessary to decide the so-called standing issue which would, at best, only involve prudential standing." *Ibid.* Our two other recent section 43(a) cases—*Sandoz Pharmaceuticals v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990), and *U.S. Healthcare v. Blue Cross of Gr. Philadelphia,* 898 F.2d 914 (3d Cir.1990)—involved litigants who were direct competitors. In *Sandoz,* we observed:

> The Lanham Act is primarily intended to protect commercial interests. See *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 692 (2d Cir.), *cert. denied,*

404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). A competitor in a Lanham Act suit does not act as a "'vicarious avenger' of the public's right to be protected against false advertising." *American Home Prods. Corp. v. Johnson & Johnson,* 672 F.Supp. 135, 145 (S.D.N.Y.1987). Instead, the statute provides a private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising.

902 F.2d at 230.

## III.

### A.

In arguing that Section 43(a) should be read as protecting consumers against false advertising, appellants invoke the "plain meaning" canon of statutory construction. *See Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 907, 909–10 (3d Cir.1990). Appellants argue that the statutory description of those entitled to sue—"any person who believes that he is or is likely to be damaged"—is sufficiently capacious to include consumers. And appellants stress that "plain meaning" informed this court's opinion in *Thorn.*

It is the case that in *Thorn* we said: "Under a plain meaning interpretation of section 43(a), it is this court's function to grant standing to Thorn if he is a person who believes that he has been damaged by Reliance's use of false representations." 736 F.2d at 932. But our analysis did not stop there:

> Having concluded that the plain language of the statute gives Thorn, a non-competitor, the right to sue for harm caused by the false representation of services in commerce, we believe that "the 'dispositive question' as to a party's standing under

---

**19.** There would appear to be a question whether the false advertising claim found cognizable by this court in *Thorn* would pass muster in the Ninth Circuit which, under *Waits* (drawing in turn on *Halicki*), "counsels that a discernibly competitive injury must be alleged." 978 F.2d at 1109.

**20.** A district court in this Circuit, in granting a motion for class certification, did rule, in reliance on *Thorn,* that consumers may bring a false advertising claim under Section 43(a). *Maguire v. Sandy Mac, Inc.,* 138 F.R.D. 444, 448 (D.N.J. 1991). The class certification order was subsequently vacated. *Maguire v. Sandy Mac, Inc.,* 145 F.R.D. 50, 53–4 (D.N.J.1992).

**1176**

section 43(a) turns on whether the party 'has a reasonable interest to be protected against false advertising.'" *Smith v. Montoro*, 648 F.2d at 609, *quoting R. Callmann, Unfair Competition, Trademarks and Monopolies*, § 18.2(b) at 625 (3d ed. 1967).... In this case, we find that Thorn in his capacity as an investor has alleged sufficient direct injury resulting from the false advertisements of the defendants and through these allegations has demonstrated a reasonable interest to be protected against under section 43(a).

736 F.2d at 933.

In *Thorn*, in short, we expressly subscribed to the Ninth Circuit's *Smith v. Montoro* pronouncement that the "'dispositive question,'" in determining who may bring a false advertising claim under Section 43(a), is whether a putative plaintiff "'has a reasonable interest to be protected against false advertising.'" More to the point, we noted that in framing the "'dispositive question'" the opinion in *Smith v. Montoro* was quoting Section 18.2(b) of the third edition of the Callmann treatise. What the Callmann treatise said, in the sentence excerpted in *Smith v. Montoro* and in turn excerpted in *Thorn*, was as follows:

> The dispositive question should be whether plaintiff has a reasonable interest to be protected against false advertising.

*1 R. Callmann, Unfair Competition, Trademarks and Monopolies*, § 18.2(b) at p. 625 (3d ed. 1967) (footnote omitted).[21] A reading of the entire paragraph in which the quoted sentence appears sheds strong light on what Callmann meant by "a reasonable interest to be protected against false advertising." The strong light shed by that paragraph appears "dispositive" with respect to the issue posed by the cases at bar:

> A false description of goods refers to any untrue statement referring to the nature of

the goods as the consumer would understand it.... Initially, the comments of the courts with respect to the right to sue under section 43(a) were difficult to understand. In *California Sportswear [California Apparel Creators v. Wieder of California*, 162 F.2d 893 (2d Cir.1947)] the court quite properly insists upon proof that the buying public accepted the label as an index of the original of the goods; but it doubted whether the statute creates a liability "in favor of a quite indefinite number of volunteer plaintiffs." This, indeed, is the only practical explanation for the judicial reluctance to recognize false advertising as a competitive tort—the "indefinite number of volunteer plaintiffs." It has been stated above that "unlawful competition is a tort *sui generis,* a violation of the order of struggle, an injury to the right of every competitor to require that his competitors act in conformity with the rules of competition. Competition is a relationship with mutual rights and liabilities and the duty to act in harmony with the rules of competition is an affirmative obligation." This means that virtually "every competitor" is injured and, therefore, that every competitor has a cause of action. The language of the Lanham Act is in complete harmony with this position, for it states that the wrongdoer in cases of false advertising is "liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." Indeed the statute goes further in recognizing that the plaintiff need not even be "in the same line of business and in competition with defendant"; it will be sufficient, in the case of a false designation of origin, that the plaintiff is "doing business in the locality falsely indicated" and, in the case of a false description of goods or services, that he believes he is or is likely to be damaged,

---

**21.** *In assessing the weight attached by this court and by the Ninth Circuit to the Callmann treatise, it bears recollection that a major portion of Rudolph Callmann's article on False Advertising as a Competitive Tort*, 48 Colum.L.Rev. 876, 877–886 (1948) *was one of two "illuminating discussions of Section 43(a)" particularly relied on by Judge Hastie in L'Aiglon*, 214 F.2d at 651. See *supra* p. 1167. The nexus between the treatise

and the *False Advertising* article is a close one: when Callmann, in the paragraph quoted from the third edition of his treatise, stated, in quotation marks, that "'unlawful competition is a tort *sui generis* ...,'" he was perpetuating a pronouncement of his own that he incanted in the *False Advertising* article, quoting from the first edition of his treatise. See 48 *Colum.L.Rev.* at 886 ·n. 48.

because, for instance, the parties are doing business on different economic levels. The dispositive question should be whether plaintiff has a reasonable interest to be protected against false advertising. If he has, his right to maintain an action should be determined by the federal law of unfair competition and the federal court will have jurisdiction over any action under section 43(a), regardless of diversity of citizenship or joinder with any related claim under copyright, patent or trademark laws. It has been said that the complaint must be framed in terms of section 43(a) to warrant removal to a federal court. This is not so. It should be sufficient that the allegations of the complaint reveal the false advertising. The public as such, i.e., the individual consumer, will have no right of action under section 43(a) and there is no need of such right. Its interest can be protected by the Federal Trade Commission, which has been authorized by section 5 of its Enabling Act to take action on its behalf. *Id.* at pp. 623–26 (footnotes omitted).[22]

We said in *Sandoz* that "[t]he Lanham Act is primarily intended to protect commercial interests," and that "[section 43(a) of] the statute provides a private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising." 902 F.2d at 230. As our holding in *Thorn* demonstrates, we do not construe Section 43(a) as limiting the class of false advertising plaintiffs to those in direct competition. But the *Thorn* plaintiff, as the major shareholder in a firm allegedly driven into bankruptcy by a principal competitor's false advertising, was a particularly appropriate standard bearer for the "commercial interests" of the bankrupt firm. "The absence of a less remote party with an interest in challenging the false representation may account for the Third Circuit's decision...." *Restatement of the Law: Unfair Competition, Tentative Draft No. 1* (April 12, 1988) 59, reprinted in *Restatement of the Law: Unfair Competition, Tentative Draft Nos. 1, 2, and*

3 (1992). We conclude, as Callmann did, that consumers fall outside the range of "reasonable interests" contemplated as protected by the false advertising prong of Section 43(a) of the Lanham Act as enacted in 1946.

## B.

■ The final question to be addressed is whether the 1988 revision of the Lanham Act enlarged the scope of Section 43(a) so as to authorize consumer suits for false advertising. As we have noted, the false advertising language of Section 43(a), as enacted in 1946,[23] provided that "[a]ny person who shall ... use in connection with any goods or services ... any false description or representation ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." 60 Stat. 441. In contrast, the 1988 revision, now in force, authorizes "any person who believes that he or she is or is likely to be damaged by such acts to sue anyone who in connection with any goods or services ... uses in commerce ... any ... false or misleading description of fact, or false or misleading representation of facts, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities ... of his or another person's goods, services, or commercial activities...." 15 U.S.C. § 43(a). The revision makes explicit that culpability attaches not only to a defendant's false advertising with respect to the defendant's goods or services but also to false advertising relating to the goods or services of others. That apart, the earlier and later versions of the false advertising aspects of Section 43(a) have generally been treated as equivalent. Thus, in *Ditri, supra,* a section 43(a) false advertising case, we noted that "we find that the language of the Lanham Act is substantially the same under both versions as it relates to the allegations in this case ..." 954 F.2d at 872 n. 1. However, since appellants in the cases at bar

---

**22.** It should be noted that the third edition of the Callmann treatise was published in 1967, four years *before* the Second Circuit's decision in *Colligan.*

**23.** See *supra* p. 1164.

place some reliance on portions of the legislative history of the 1988 revision, we think it appropriate to consider directly the question whether Congress in 1988 changed the law so as to authorize consumer suits for false advertising.

In her brief on appeal, appellant Guarino quotes from a 1988 report of the House Judiciary Committee which discussed *Colligan* with disapproval, opining that the Second Circuit's "analysis not only is unsupported, but also appears outdated." H.R.Rep. No. 100–1028, 100th Cong., 2d Sess., at 13. The Judiciary Committee not only criticized *Colligan*, it reported favorably a bill that would have amended Section 43(a) to authorize "any person, *including a consumer*, who believes that he is or is likely to be damaged by the use of any such false description ·or representation." *Id.* at 32 (emphasis in original). However, "the provision was deleted in a House–Senate Conference Committee." 2 *J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition* § 27.04[5] at p. 27–55 (3d ed. 1992).

Appellants Serbin and Baker note that Congressman Kastenmeier, manager of the 1988 revision of the Lanham Act on the floor of the House, made plain his strong conviction that consumers ought to be able to sue under § 43(a) and indeed were already entitled to sue under the statute as originally enacted in 1946. On October 19, 1988, in the course of debate on the day of final House action, Congressman Kastenmeier said:

> Consumer interests have also been the subject of·compromise in this legislation. As reported by the House Committee on the Judiciary, the bill would have explicitly acknowledged that consumers have standing to sue for violations of section 43(a), which provides a cause of action for unfair competitive acts such as false and misleading advertising. The agreement, however, deleted this provision from the bill. While I support the deletion as part of the necessary compromise on this bill, it is unfortunate in the long run. I continue to believe that consumers already have standing to sue under current law, and that the provi-

> sion that was deleted only clarified that law.

134 Cong.Rec. 31850 (Oct. 19, 1988).

But against Congressman Kastenmeier's words must be measured the subsequent words of Congressman Fish:

> I would like to comment on one provision which was taken out of H.R. 5372 which was reported by the Judiciary Committee and which is not found in this compromise, it would have provided consumers with standing to sue under section 43(a) of the Lanham Act. This provision, which had not been studied or evaluated by anyone for its long-term effects on Federal unfair competition law, would have radically altered the nature of the Lanham Act and would have had the likely effect of turning the Federal courts into a small claims court.

134 Cong.Rec. 31854 (Oct. 19, 1988).

With matters in this posture, the verdict must be that rendered by Professor McCarthy, who characterizes Congressman Kastenmeier's statement as "only an optimistic opinion by a representative whose proposal was defeated in a House–Senate compromise." 2 *McCarthy, supra,* § 27.04[5] at p. 27–55 (3d ed. 1992).

### Conclusion

The question of policy that underlies these appeals is not whether false advertising is a bad thing. It is, and consumers are victimized by it. The question of policy is what institution, or set of institutions, should be charged with identifying false advertising, ameliorating its malign consequences, and, in the long run, shrinking its dominion. State courts have substantial authority in this field by virtue of judge-made misrepresentation law, and some state legislatures have, through such legislation as the Uniform Deceptive Trade Practices Act, undertaken to widen that authority. Congress conferred a measure of public enforcement authority on the Federal Trade Commission and, through section 43(a) of the Lanham Act, has vested in the federal courts jurisdiction to entertain certain categories of private law suits predicated on claims of false advertising. Given this commitment of institutional resources to

the cause of consumers injured by false advertising, if Congress had intended to make the additional commitment involved in recognizing a federal tort of misrepresentation and in bestowing access to federal fora without regard to the amount in issue, we are confident that the legislative history of the Lanham Act would have borne clear witness to that commitment. Because we find no clear indication of such an unusual commitment and because we are satisfied that section 43(a) had an important, though narrower and quite distinct purpose, we join the Second Circuit in holding that Congress, when authorizing federal courts to deal with claims of false advertising, did not contemplate that federal courts should entertain claims brought by consumers.[24]

Some have suggested that the Federal Trade Commission has not been a sufficiently effective watch-dog of consumer interests,[25] and that the protections afforded consumers in state courts are inadequate.[26] Such seemed to be the view of the House Judiciary Committee in 1988, when it proposed amending section 43(a) expressly to include consumers among those entitled to sue. *H.R.Rep.* 100–1028 (100th Cong.2d Sess., 1988) 13–14. However, that view did not prevail in Congress at that time.

In determining whether Section 43(a) should be enlarged in the manner proposed, Congress needs to consider what other tasks the federal courts now perform and whether some of those tasks—tasks that would otherwise compete with Section 43(a) claims for

---

**24.** In construing statutes we do well to bear in mind the precepts laid down by Professor David Shapiro:

> ... [T]he tilt towards continuity is in fact a useful guideline in discerning legislative purpose, and ... it is consistent with values that lie at the heart of our constitutional system and the role of courts. Courts push beyond their proper limits when they interpret statutes to yield results that, for political or other reasons, may well have lain beyond the legislature's intended reach. On the other hand, courts have a unique responsibility to accommodate change to a complex and relatively stable structure of rules and principles.

Shapiro, *Continuity and Change in Statutory Interpretation*, 67 *N.Y.U.L.Rev.* 921, 960 (1992).

**25.** See, e.g., the September 8, 1988 testimony of Bruce Silverglade, Legal Director of the Center for Science in the Public Interest, before the Subcommittee on Courts, Civil Liberties and the Administration of Justice of the House Judiciary Committee, excerpted at *H.R.Rep.* 100–1028 (100th Cong.2d Sess., 1988) 14. See also, Note, *False Advertising Claims and the Revision of the Lanham Act: A Step In Which Direction?*, 59 *U.Cin.L.Rev.* 957, 965 (1991).

Shortly before *Guarino* was filed, Sun Company, Inc. and Sun Refining and Marketing Company entered into a consent agreement with the Federal Trade Commission under which the respondents agreed to cease and desist from, *inter alia*, "making any representation ... about the superiority of ULTRA 93.5 and 94 in providing engine power or acceleration" unless respondents were prepared to back up the representations with "competent and reliable scientific evidence." *In the Matter of Sun Company, Inc.*, FTC 902 3268 Order, Part I (June 11, 1991). Commissioner Owen dissented, arguing that "the public interest would have been better served if the remedy in this matter had provided stronger

incentives to insure compliance with the FTC Act, or had provided other relief that would truly benefit consumers." *Dissenting Statement of Commissioner Deborah K. Owen*, p. 2.

**26.** See Note 59 *U.Cin.L.Rev.* at 965–55, and testimony of Bruce Silverglade, both cited *supra*, note 25. See also Thompson, *Consumer Standing Under Section 43(a): More Legislative History, More Confusion*, 79 *Trademark Rep.* 341, 353 (1989), noting that a number of states, including some that have adopted the Uniform Deceptive Trade Practices Act, do not authorize consumer class actions, and "[s]ince ... an individual's damages may be too insignificant to warrant bringing a suit, the federal provisions for class actions would be particularly suitable for use in consumer deception cases." But, as pointed out in Callagy and Lusins, *Private Consumer Remedies for False Advertising*, in *False Advertising and Commercial Speech* (Practicing Law Institute Course Handbook 1992) 336, some states, including some large ones, do authorize consumer class actions, citing *Miner v. Gillette Co.*, 87 Ill.2d 7, 56 Ill.Dec. 886, 428 N.E.2d 478 (1981) (authorizing class action under Illinois Consumer Fraud and Deceptive Business Practices Act on behalf of national class of 180,000 would-be acquirers of "accent" butane lighters defendant undertook to distribute free as part of promotion of "cricket" lighters but was unable to deliver in sufficient quantities due to over-demand); and *Committee on Children's T.V. v. Gen. Foods*, 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660 (1983) (authorizing classes of parents and children to sue breakfast cereal manufacturers for allegedly fraudulent broadcast advertising). As to the possibilities of bringing private consumer false advertising claims under the Federal Trade Commission Act or under RICO, see Callagy and Lusins, *Private Consumer Remedies*, *supra*, at 329–33.

federal judicial attention—should be withdrawn from the cognizance of federal courts. There is plainly a national consensus that federal courts should be prepared to devote as much time as is necessary to the careful adjudication of cases involving claims of employment and housing discrimination, of dilution of voting rights, of fraudulent marketing of securities, of differential treatment of persons with disabilities, or of injury to the environment. Is there the same consensus with respect to diversity cases involving alleged negligence in the driving of an automobile, or alleged physician or lawyer malpractice, or the filing of allegedly fraudulent insurance claims? The responsibility for answering these questions lies, in the first instance, with Congress. It is Congress that determines the agenda of federal trial courts. In making that determination, Congress establishes priorities about the proper utilization of the energies of an institution of limited size and resources—the federal judicial system.[27]

The judgments below are affirmed.

Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and LEWIS, Circuit Judges, and POLLAK, District Judge.*

SUR PETITION FOR REHEARING

Dec. 29, 1993.

The petition for rehearing filed by appellant in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not

having voted for rehearing by the court in banc, the petition for rehearing is denied.

---

**27.** At its September 1993 session the Judicial Conference of the United States voted to:

Reaffirm the federal judiciary's historical commitment to the principle that the jurisdiction of the federal courts should be limited, complementing and not supplanting the jurisdiction of the state courts.

Endorse the principle that the size of the Article III Judiciary should be limited to the num-

ber necessary to exercise such jurisdiction, thus allowing a policy of carefully controlled growth.

.10 *The Third Branch* No. 10 (Oct. 1993) 1.

